# BOARD OF EDUCATION OF SALT LAKE CITY v. WRIGHT-OSBORN CO. *ET AL.* (JOSEPH NELSON SUPPLY CO. INTERVENER).

No. 2930.   Decided April 19, 1917.   (164 Pac. 1033.)

1. SCHOOLS AND SCHOOL DISTRICTS — CONSTRUCTION CONTRACTS — ARCHITECT'S CERTIFICATE.   Under a contract for the construction of a school building authorizing the school board to terminate the contract on certificate of the architects, where two architects who were partners were named, but one of them was a mere silent partner, and the other did all of the work of preparing the plans and specifications and superintending and overseeing the erection of the building, a certificate on which the board terminated the contract was not insufficient because it represented the judgment of only the active architect. (Page 462.)

2. SCHOOLS AND SCHOOL DISTRICTS—CONSTRUCTION CONTRACTS—TERMINATION—NOTICE—"AND"—"AT ONCE."   Under a contract for the construction of a school building which provided that, if the contractor should fail to supply sufficient labor or materials, or in the performance of any of the agreements therein, such failure being certified by the architects, the school board should be at liberty after three days' written notice to the contractor to provide any such labor or materials, and deduct the cost from moneys due the contractor, "and" that, if the architects should certify that such action be taken, the board should also be at liberty "at once" to terminate the employment of the contractor and complete the work, the board was entitled, upon the architects certifying that the contract should be terminated, to terminate it immediately without notice, as "at once" meant immediately and without delay, while "and" meant in addition to or something added to what preceded it.   (Page 463.)

3. CONTRACTS—CONSTRUCTION—MEANING OF LANGUAGE.   All the words used in a contract, must, if possible, be given their usual and ordinary meaning and effect; as it will not be assumed that the parties did not intend what their language implies.   (Page 465.)

4. SCHOOLS AND SCHOOL DISTRICTS—BUILDING CONTRACTS—LIABILITY OF SURETY.   A school board, having terminated a contract for the construction of a school building as authorized by the contract, advertised for bids for the completion of the work, and required contractors to state in their bid a guaranteed maximum cost for completion of the work, and the percentage for which

454          SUPREME COURT OF UTAH.          [April

Bd. of Ed. of Salt Lake City v. Wright-Osborn Co. et al., 49 Utah 453.

they would perform the work, but provided that payment would be based only on the actual cost of labor and material, and that the contractor's percentage would be based thereon. *Held* that, assuming that the board was required to advertise for bids to complete the work, and that the original contractor's surety was entitled to insist on this being done, there was nothing in the requirement that bidders include a guaranteed maximum cost preventing competitive bidding, 'and the surety was liable where the cost of completion exceeded the original contract price.  (Page 467.)

5. SCHOOLS AND SCHOOL DISTRICTS—BUILDING CONTRACTS—CONTRACTOR'S SURETY—LIABILITY.  Assuming that a provision in such contract requiring a bond which should expire two years from the date of the contract controlled the construction of the bond, though not contained therein, the surety was nevertheless liable where the contractor defaulted within two years, though suit was not brought and the amount expended by the obligee in completing the work was not ascertained within the two years. (Page 468.)

6. SCHOOLS AND SCHOOL DISTRICTS—CONTRACTOR'S SURETY—EVIDENCE—ARCHITECT'S CERTIFICATE.  Where a contract for the construction of a school building provided that, if the board completed the work upon the contractor's default, the expense of completing the work should be audited and certified by the architects, and that the decision of the board thereon should be final and conclusive, the architects' audit and certificate was admissible against the contractor's surety in an action on the bond.  (Page 468.)

7. APPEAL AND ERROR—REVIEW—CONFLICTING FINDINGS—SEPARATE TRIALS OF ISSUES.  Under a contract for the construction of a school building, the school board terminated the contract and completed the work pursuant to an architect's certificate stating that the contractor had defaulted in certain particulars, and among other matters was installing boilers not in compliance with the specifications.  In an action against the surety for the difference between the cost of the work and the contract price, the party which sold the boilers to the contractor intervened and sought judgment against the surety for the purchase price The issues between plaintiff and the surety were tried before a jury, which found for plaintiff, and found that the specifications adopted by the architect were those known as specifications No. 1, with which the boilers did not comply.  The issue between the intervener and the surety was then tried without a jury, and the court found that specifications No. 2 were those adopted, and that the boilers complied therewith.  *Held* that, while these

findings were in direct conflict, as they were based on conflicting evidence, it was the exclusive province of the jury in one case and of the judge in the other to determine the weight of the evidence and the credibility of the witnesses, and the Supreme Court could not interfere with the findings, but must treat them as though they constituted the result in two separate and distinct cases. (Page 474.)

8. SCHOOLS AND SCHOOL DISTRICTS—CONSTRUCTION CONTRACTS—CONTRACTOR'S BOND—LIABILITY. Under the bond of a contractor for the construction of a school building conditioned for the payment of labor and materials, the surety was liable for the purchase price of boilers and other materials sold the contractor for use in the construction of the building and fully complying with all specifications, though the school board in completing the work after the contractor's default removed the boilers and part of the other materials and substituted different boilers. (Page 475.)

Appeal from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Action by the Board of Education of Salt Lake City, against the Wright-Osborn Company and the Fidelity & Deposit Company of Maryland, in which the Joseph Nelson Supply Company intervened.

Judgments in favor of the plaintiff and the intervener. The Fidelity & Deposit Company of Maryland Appeal.

AFFIRMED.

*Stephens & Smith, Dey, Hoppaugh & Fabian,* and *Guy Le Roy Stevick* for appellant.

*James Ingebretsen* for respondent intervener.

*M. E. Wilson* and *Walton & Walton* for respondent Board of Education.

FRICK, C. J.

The plaintiff, hereinafter designated respondent, commenced this action against the Wright-Osborn Company as contractor, hereinafter styled contractor, and against the Fidelity & De-

posit Company of Maryland, hereinafter called appellant, in the district court of Salt Lake county, to recover on an indemnity bond made and delivered by the appellant to the respondent wherein the former agreed to indemnify the latter for any loss or damage it should sustain in case the contractor failed, neglected, or refused to comply with the provisions and conditions of its contract. The Joseph Nelson Supply Company, hereinafter called intervener, intervened in the action and set up a cláim for material sold and delivered to the contractor which it alleged it had delivered to the contractor to be used in the school building being erected by the respondent, and which had not been paid for by the contractor.

The respondent alleged that it entered into a contract with the contractor whereby the latter agreed to furnish all the material and labor necessary to complete a heating and ventilating plant or system in a high school building which respondent was then erecting at Salt Lake City, Utah, that the contractor was required to furnish a bond for the faithful performance of its contract, and that it would promptly pay for all labor and material. The contract is set forth in full as an exhibit and is made a part of the complaint. The terms and conditions of the contract are numerous and specific. It is not necessary, except in one partncular, to set forth the many conditions and provisions contained in the contract, since those that are deemed material will be specifically referred to in the course of the opinion. Since the action, however, is more particularly based upon article 13 of the contract, and in view that one of the controlling questions involved on this appeal depends upon the construction of certain provisions contained therein, we quote said article in full. It reads as follows:

"Should the contractor, at any time refuse or neglect to supply a sufficiency of properly skilled workmen or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect, or failure being certified by the architects, the said second party shall be at liberty after three days' written notice to the contractor or to any of his agents to provide

any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractor under this contract; and such certificates of the architects, together with the action of the board thereon, shall be final and conclusive; and if the architects shall certify that such action be taken, the said second party shall also be at liberty at once to terminate the employment of the contractor for the said work, and immediately to enter upon the premises and to take possession of all materials thereon, together with all tools, machinery, apparatus and conveniences, and in case of such discontinuance of the employment of the contractor, he shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expenses incurred by the said second party in finishing the work, such excess shall be paid by the said second party to the contractor, but if such expense shall exceed such unpaid balance, the contractor shall pay the difference to the said second party. The expense incurred by the said second party, as herein provided, either for furnishing materials, or for finishing the work and any damages incurred through such default, together with the value of the use of tools, machinery, materials, and conveniences that may be taken by the said second party, shall be audited and certified by the architects, and the decision of the said second party thereon shall be final and conclusive. And this shall be construed to mean not only the completion of the heating and ventilating system for the buildings, but the removal of all rubbish from the same, as well as from the grounds.''

The respondent, after alleging that the contractor had entered into the contract as aforesaid, also further alleged:

That the appellant had made and delivered to the respondent a certain bond in which appellant had agreed to indemnify the respondent in case said contractor should fail to comply with the conditions of its contract in completing and installing said heating and ventilating plant; that the contractor had failed to comply with the provisions of its contract in the following particulars, namely: That the contractor had "attempted to furnish material of a poor and inferior and im-

proper quality, * * * and not of the quality required by the specifications and contract, and furnished and delivered at said building and attempted to put in place therein inferior and improper boilers not in accordance with the contract and insufficient for the purpose for which they were used, and * * * wholly neglected to supply a sufficiency of properly skilled workmen and failed to prosecute the work with promptness and diligence; that on the 17th day of January, 1913, the architect mentioned and referred to in said building contract, 'Exhibit 1,' certified in writing that said contractor had refused and neglected to supply a sufficiency of properly skilled workmen and had refused and neglected to supply a sufficiency of material of the proper quality, and had failed to prosecute the work with promptness and diligence, and had failed generally in the performance of the agreements on said contractor's part to be performed, and further certified in writing to the plaintiff that it was necessary for the plaintiff to terminate the employment of the said Wright-Osborn Company in respect of and arising from said contract, and that such action of termination of said employment should be taken by the plaintiff, and thereupon, and on the same day, the said plaintiff did, by resolution, at once terminate the said employment, and thereupon notified each of the defendants of said action;'' that the contractor furnished material of inferior quality for hangers for the air ducts and that said hangers were improperly placed; that the contractor failed ''to do skilled workmanship in making the joints'' in certain pipes and failed to ''properly ream said pipes''; that said contractor ''wholly failed and refused to proceed in the execution and performance of its said contract, so that agreeably to the provisions of said contract the further employment of the said * * * (contractor) was by plaintiff terminated.''

Respondent then alleged that it had completed the work the contractor had agreed to do, specifically stating the cost thereof, and demanded judgment for the amount it had expended in excess of the contract price. A copy of the indemnity bond made and delivered by the appellant was also attached to and made a part of the complaint. The special

provisions of the bond that are material to this controversy will be referred to in the course of the opinion. In view that the sufficiency of the architect's certificate is assailed, we append the same in full. It reads as follows:

"We have made an exhaustive investigation of the facts and circumstances relative to the performance of the contract existing between your board and the Wright-Osborn Company, dated July 1, A. D. 1912, and with great particularity have examined into the facts relative to the performance by that company of said contract, and we desire to report and certify as follows:

"That said company acting as said contractor, has failed and neglected to perform said contract in many particulars, some of which failures and neglects we will particularly refer to.

"In the first place, the said contractor has brought upon the ground and delivered at the building certain galvanized iron for the air ducts to be constructed by said contractor in the building, which galvanized iron is of poor quality and not of the quality required by the specifications furnished by us to the contractor, and we have refused to accept said iron.

"In the second place, the contractor has delivered at the building and is now engaged in putting in place three Kewanee boilers. The boilers tendered by the said contractor are not such as are called for by the specifications, and said boilers are insufficient for the purposes sought to be accomplished by them. After a thorough investigation, we are satisfied that these boilers tendered by said contractor will not sustain a pressure to exceed 110 pounds, and that you will be unable to insure said boilers for a greater pressure than 110 pounds and the boilers required by the specifications call for a pressure of 125 pounds. And then the tubing of the boilers is $3\frac{1}{2}$ inches in diameter, whereas the specifications call for tubing 4 inches in diameter. And we are reliably informed that the boilers tendered by the contractor are of less value than the boilers called for by the specifications.

"Furthermore, the contractor has neglected to supply a sufficiency of properly skilled workmen, and from the situation that now exists it appears that said contractor will be un-

able during the continuance of this contract to supply a sufficiency of properly skilled workmen, and the said contractor has failed and is still failing to prosecute the work with promptness and diligence, and that the contractor indicates a disposition in the handling of this work that convinces us that said contractor will be unable to carry on the work with that degree of expedition contemplated by the contract; in fact, the contractor indicates so little capacity that it is difficult under all the existing conditions to prophesy a date when said contractor will complete the contract in accord with the plans and specifications.

"On account of certain labor union difficulties which have arisen between this contractor and the labor unions of this city, it seems that the entire work in the building, not only that contemplated by the contract with the Wright-Osborn Company, but that required from other contractors working upon said building, will be so delayed and hampered that we are quite discouraged and cannot come to any other conclusion than to say that, if the high school building is to be erected, within the time contemplated by your honorable board and by the contracts which your board has entered into, and in accord with the plans and specifications, no other course of action can be followed than for your honorable board to terminate the employment of the said contractor, which employment arises by virtue of that certain contract existing between your board and the Wright-Osborn Company.

"The above statement while not intended to be exclusive, contains the important reasons for the certificate and recommendation which follows, and we believe your honorable board will deem it sufficient to justify said certificate and recommendation.

"We therefore certify that it is necessary for your honorable board to terminate the employment of the said Wright-Osborn Company, which employment arises by reason of that certain contract existing between your board and the said Wright-Osborn Company, said contract bearing date July 1, A. D. 1912, and we certify that said action shall be taken by you, and we recommend that said employment of said Wright-

Osborn Company existing by reason of said contract shall immediately be terminated.''

The contractor did not answer the complaint nor appear in the action. The appellant filed its answer, in which, after making specific admissions and denials, it set up various defenses, all of which are sufficiently reflected in the points its counsel have raised and which are hereinafter discussed.

The case was tried to a jury, which returned a verdict in favor of the respondent, from which this appeal is prosecuted.

Counsel for appellant in their brief have grouped all of their assignments of error under the following heads: (1) and (2) That the certificate of the architect on which the employment of the contractor was terminated is void; (3) that the employment of the contractor was terminated without notice, and is therefore void; (4) that the appellant is not liable in this action because the respondent was not legally damaged; (5) that no recovery can be had on the indemnity bond because it ceased to be in force before the cause of action arose; (6) that the respondent was itself in default, and hence could not legally enforce a forfeiture against, and therefore terminate, the employment of the contractor; (7) that the court erred in restricting the cross-examination of the architect; (8) that the court erred in permitting respondent to amend its complaint in certain particulars; and (9) that the court erred in withdrawing certain issues from the jury.

Counsel state their first objection to the architect's certificate in the following words:

''This suit is brought under the contract; and plaintiff must therefore show the performance of conditions on its part, one of which is the issuance of a valid architects' certificate authorizing termination. The certificate here is void because based upon a finding of fact not submitted to the architect and which he had no authority to decide.''

We have read the evidence and the charge of the court with care. We cannot perceive in what respect the architect failed to comply with the provisions of the contract in making the certificate. True, counsel argue that the architect did not act upon his own judgment, and, further, that he did not act in good faith in making the certificate. The court submitted

those questions to the jury, and in doing so adopted some of the requests offered by appellant's counsel. The contention that the architect based his judgment on matters outside of the contract was also fully covered by the court's charge to the jury. The court charged the jury that, if they should find that the architect's certificate was based on facts, or on alleged defaults outside of the contract, their finding must be in favor of the appellant. The jury found against appellant's contention on that issue, and there certainly is sufficient evidence to sustain such a finding.

The same is true with respect to the contention that the architect did not act in good faith in making the certificate. That issue was also fully covered by the court's charge, and the jury also found against that contention.

The first point raised by counsel must therefore fail.

We fail to perceive any merit to counsel's second point. The objection to the certificate is that it reflects the judgment of only one of the named architects, and is, for that reason, void. No doubt, under certain circumstances the objection might not only be of force, but it might be fatal to the certificate. The undisputed evidence is to the effect, 1 however, that in preparing all of the plans and specifications upon which the high school building was constructed, including the contract in question, James L. Chesebro acted alone, that Eldredge was a mere nominal partner, that is, a silent partner, so to speak, and at no time took any part in any of the matters pertaining to the making of the plans and specifications for the high school building or in superintending or overseeing the erection thereof, and that Chesebro acted alone in that regard. Indeed, it was shown that Eldredge did not know anything whatever respecting the matters pertaining to the execution of the contract in question. Counsel's contention, therefore, that the contractor was entitled to the judgment of both architects named in passing upon whether the provisions of the contract were being disregarded or not, under the facts and circumstances, is of little, if any, importance. No doubt if the two architects had acted in the matter, then, both upon principle and under the authorities, the contractor would have been entitled to the judgment of

both.   The architects, in one sense, would then have been arbitrators, and either party would have been entitled to their combined judgment.   In this case, however, only one acted; and while the business was done in the name of Eldredge & Chesebro, yet Eldredge was a mere silent partner, and Chesebro did all that was done in the matter precisely as though Eldredge was not nominally connected with the business.   In view that Eldredge knew nothing about the matters, his judgment could have been of no aid to any one, and in view that Chesebro acted alone, and was, as the record discloses, by all regarded as the sole architect on the building, his act must be deemed as the act of the architects named in the contract.   Any other view would merely enforce the latter and entirely ignore the essence of the provisions of the contract covering the powers and duties of the architects.

In making this contention counsel seem somewhat inconsistent.   They strenuously insist that the architect in making the certificate must act only upon personal observation and knowledge.   If that contention be sound, how can they consistently contend that Eldredge, who had absolutely no knowledge respecting the matters contained in the certificate, should participate therein?   For him to have done so would have been the same as though a stranger had been called in to act. That certainly is not what is contemplated by the provisions of the contract.

This objection must therefore likewise fail.

The third point raised by counsel, in our judgment, presents the serious question on this appeal.   By referring to article 13 of the contract, which we have set forth in       **2** full, it will be seen that, if the contractor shall fail, refuse, or neglect to do. the things therein enumerated and such failure, refusal, or neglect—

''being certified by the architects, the said second party (respondent) shall be at liberty, after three days' written notice to the contractor,   *   *   *   to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractor under this contract; and such certificate of the architects, together with the action of the board thereon, shall be final and conclusive;

*and if the architects shall certify that such action be taken, the said second party shall also be at liberty at once to terminate the employment of the contractor, * * * and immediately enter upon the premises,"* etc.   (Italics ours.)

Appellant's counsel vigorously insist that, in view that in this case the employment was terminated upon the certificate of the architect without giving three days' notice to the contractor, therefore the termination was void and of no effect. In support of the contention counsel, among other cases, cite *McClellan* v. *McLemore* (Tex. Civ. App.), 70 S. W. 224; *George A. Fuller & Co.* v. *Doyle,* (C. C.) 87 Fed. 687; *American, etc., Co.* v. *Butler,* 165 Cal. 497, 133 Pac. 280, Ann. Cas. 1916 C, 44; and *Connell* v. *Higgins,* 170 Cal. 541, 150 Pac. 769. It is not necessary to refer to the other cases cited by counsel upon that point, since they really have no application. Indeed, all of the foregoing cases, except the one from Texas, were disposed of on other grounds. While it is true that in all of the cases cited the questions arose out of contracts containing provisions similar to the one in question here, and while in the course of the opinions the provisions in the contracts providing for notice and the termination of the employment of the contractor are either discussed or referred to, yet the provisions of the contracts in question in those cases were not only different from the provisions of the contract in question here, but the decisions were based on other grounds. In the Texas case, however, the court directly passed upon the provision with regard to the termination of the employment, and held that the employment of the contractor could not legally be terminated without giving the three days' notice provided for in the contract. The provisions of the contract respecting the giving of notice passed on by the Texas court, in our judgment, was, however, materially different from the provisions upon that subject in the contract in question here. In the Texas contract it was provided that in case the contractor shall fail, refuse, or neglect to provide the labor or material, etc.—

"such refusal, neglect, or failure being certified by the architect the owner shall be at liberty, after three days' notice to the contractor, to provide any of such labor or materials and

to deduct the cost thereof from any money then due or there-
after to become due to the contractor under this contract; and
*if the architect shall certify that such refusal, neglect or fail-
ure is sufficient ground for such action the owner shall also
be at liberty to terminate the employment of the contractor,"*
etc.    (Italics ours.)

Notwithstanding that the foregoing language, to our minds,
is much more favorable to counsel's contention, the Texas
Court of Civil Appeals expressed some doubt with regard to
whether the three days' notice is required or not in case the
contract is terminated upon broader grounds.    The provision
in the contract here which gave the respondent the right to
terminate the employment reads quite differently from the
provision in the Texas case.    After providing that after giv-
ing three days' notice to the contractor respecting the latter's
failure to comply with the provisions of the contract there
enumerated the owner may supply the defects and recover all
costs thereof from the contractor, the contract further pro-
vides:

"And if the architects shall certify that such action be
taken, the said second party shall also be at liberty at once to
terminate the employment of the contractor," etc.

It is a cardinal rule of construction that all the words used
by the parties must, if possible, be given their usual and ordi-
nary meaning and effect.    It will not be assumed that the
parties to the contract did not intend what their language im-
plies.    Again, if it be true that it was the intention of the
parties that three days' notice be required before the em-    **3**
ployment under the contract in question can be term-
inated under all circumstances, then it is equally true that the
parties did not use apt words to express that intention or to
convey their meaning.    While it is true that the owner is re-
quired to give three days' notice before he can supply the de-
fects in the material, etc., it is, however, also true that if the
architect shall certify that "such action be taken," that is,
if the architect shall certify that the employment be termin-
ated, then the owner may do that "at once," that is, forthwith.
Why say "at once" if three days' notice is required?    In
view of the subject-matter, "at once" can only mean what the

term implies, namely, immediately and without delay.   If the three days' notice must precede the termination of the employment under the circumstances, then it was wholly unnecessary to use the term "at once," since after the three days had elapsed the owner, upon the receipt of the architect's certificate to that effect, could terminate the employment without further delay, and hence without further notice of any kind.  Moreover, the word "and" in the provision in the contract in question is also of peculiar significance.   It is there used in the sense of "in addition to," "something added to what precedes it."   In addition to the right given the owner, after giving the three days' notice, to supply the things enumerated therein it is given an additional right, namely, at once to terminate the employment of the contractor if the architects shall certify that such be done.   That is just what the parties stipulated might be done, and, having done so, courts have no alternative save to enforce the terms of the contract.   While it is quite true that an argument could also be presented in favor of the contention made by counsel for the appellant, yet in making that argument something must always be interpolated into the contract that is not found therein either in express or by necessary implication, and under such a construction it is impossible to give all of the words used in the contract their usual and ordinary meaning and effect.   Moreover, the certificate of the architect in this case covers defects which, it would seem, no amount of notice could have obviated or cured, and that such conditions might arise must necessarily have been contemplated by the parties, and that such is the case is clearly indicated in the contract.   True, as counsel contend, there are also matters stated in the certificate for which a termination of the employment was not provided for in the contract, but that question was thoroughly gone over at the trial, and the matters in that regard were all properly submitted to the jury, and were found in favor of respondent.   While we have arrived at the foregoing conclusions with some hesitation, yet we are firmly of the opinion that this objection cannot prevail.

In their fourth point counsel assail the right of the respondent to recover from appellant the amount claimed by it for

còmpleting the heating and ventilating plant. It is contended that respondent was not authorized to recover the    4
cost of completing the plant except after advertising for
bids and letting the job to the lowest bidder as it was required
to do in letting the original contract. The respondent advertised for bids to complete the heating and ventilating plant according to the specifications and in accordance with the terms
of the contract, but in the advertisement for bids it required
from all the bidders the following statement:

"Contractor will state in his bid a guaranteed maximum
cost for the completion of said contract as called for, and also
state the percentage for which he will perform the work, but
it must be distinctly understood that payment will be based on
and made only for the actual cost of labor and material, and
the precentage will be based thereon. Contractor will also
note that he must be in position to take up the work immediately and complete same by August 1, 1913."

Upon the foregoing advertisement there were seven bidders
who submitted bids. The highest bid for completing the heating and ventilating plant was for $68,750 and 11½ per cent.
additional for superintendence, while the lowest bid was for
$65,000, plus 10 per cent. for the latter purpose. The contract was let to the lowest bidder. The original contract price
for completing the plant was $53,879. The bids were thus all
largely in excess of the contractor's original bid. The evidence is undisputed that it cost the sum of $72,000 to complete the heating and ventilating plant. That sum was $18,-
021 in excess of the contractor's bid, and it was stipulated
at the trial that, after deducting all credits due to the contractor, if the respondent was entitled to judgment under
the facts and the law, then the amount thereof should be
$17,000.

Assuming, without deciding, counsel's contention that,
under the law, respondent was required to advertise for bids
to complete the plant precisely the same as it was required
to do in order to construct the high school building, and further assuming that the appellant, without showing actual
prejudice, may legally insist upon that method of completing the plant, yet we fail to see in what respect respondent

has failed to comply with the law as counsel insist it has.    We are not unmindful of the fact that counsel urge that, in view that the bids were based upon actual cost for labor and material with a percentage added for supervision, therefore the bids were not competitive; that is, as we understand counsel, in view that the bidders were asked to include in their bids (giving it in the language contained in the notice to bidders) "a guaranteed maximum cost for the completion of said contract," therefore the bidders were not free to bid and the bids were not competitive.    Now, in what way do those bids differ from the usual and ordinary bids?    True, respondent required each bidder to include in his bid a statement of the maximum cost for completing the plant.    Let it be assumed that in that respect the bids were unusual; yet would not each bidder, irrespective of that requirement, in arriving at the amount of his bid, necessarily have taken into consideration the actual cost of completing the plant, that is, the cost of all labor and material, whether he expressed it in his bid or not?  By what other method could any bidder have arrived at the actual amount that his bid must be in order that he might receive an amount equal to what it would cost him to complete the plant?    The mere fact that the bids varied as they did is conclusive proof that the bidders arrived at the result in this case precisely the same as they do in all cases of competitive bidding.    Why, then, were the bids in question, in truth and in fact, not competitive, although differing in the particulars stated from the usual method of bidding?    There is, however, not the slightest hint that the plant could have been completed for less than respondent was required to pay.    Appellant's objection is therefore purely a legal or technical one which, in our opinion, for the reasons stated, ought not to prevail.

The fifth point is based on the provision in the contract that the contractor shall furnish a bond for the faithful performance of the contract and prompt payment of all labor and material which shall "expire two years from the date of **5, 6** the contract."    There is nothing contained in the bond itself concerning that matter.    Assuming, however, that the provision contained in the contract is controlling, yet there is no reason why the bond was not in full force and effect when

the defaults set forth occurred. Even though the provision in the contract controls, it still must receive a reasonable construction and application. The meaning, as well as the apparent intention, of the provision clearly is that the obligation in the bond shall not cover any defaults of the contractor under his contract which occur after the expiration of two years. The evidence is without dispute that all the defaults in controversy occurred long before the two years had expired. The mere fact that suit was not brought within the two years, or that the exact amount of what had been expended by respondent had not been ascertained within two years, in no way affects its right to recover on the bond. In this connection it is also contended that the court erred in admitting in evidence the audit and certificate of the architect showing the amount respondent had expended to complete the heating and ventilating plant.. In the absence of any claim of fraud, and in view of the stipulations in the contract that the audit and certificate in question shall be competent evidence, we hardly grasp the force of counsel's contention. The audit and certificate would certainly have been proper evidence as between the contractor and the respondent, and hence they are likewise proper as against the appellant. That such is the law is clearly held in the case of *Connell* v. *Higgins,* 170 Cal. 541, 150 Pac. 769.

The next point argued is that the respondent was itself in default when it terminated the employment of the contractor, and hence its action in that regard was illegal. The contention is based upon the familiar principle that, where one of the contracting parties is in default, he cannot legally enforce a forfeiture based on a default of the other party to the contract. That such is the law may be conceded. It must suffice to say, however, that there is nothing in this case to make the principle applicable.

It is further contended that the court erred in restricting appellant's counsel in cross-examining the architect. A careful reading of the cross-examination of that witness shows that the court gave counsel all the latitude they were entitled to under the law. Indeed, the court in many instances went far beyond what counsel could demand as a matter of right, and

in no instance did the court abuse its discretion in denying further cross-examination. There is no merit to this contention.

Nor is there any merit to the eighth point, namely, that the court erred in permitting the respondent to amend its complaint. The court restricted the operation of the amendment, and, as restricted, it was entirely harmless.

Finally, it is contended that the court erred in withdrawing certain issues from the jury in its charge. We have carefully read the court's charge to the jury, and, after doing so, have failed to discover anything to justify counsel's contention. The charge covers every issue presented by the pleadings and the evidence. Moreover, the charge covers many collateral matters, which, from an inspection of appellant's requests, were evidently taken therefrom by the court.

The record discloses that the case was fairly presented and ably defended, and while, upon the record alone, we might, on some facts, have arrived at a conclusion different from that arrived at by the jury, yet every essential fact is supported by substantial evidence. We remark that every objection and exception is based upon what is usually termed technical grounds. While it is true that parties should be given, and clearly have, the right to insist upon such grounds, yet it is also true that where, as here, all legal and technical rights have received full consideration, and where nothing is demanded except that which the appellant clearly obligated itself to fulfill, courts should not shrink from enforcing the obligations unless there is some good legal reason why the obligations should not be enforced.

This disposes of the appeal in so far as it affects the respondent. We now proceed to a consideration of the appeal from the judgment in favor of the intervener.

The intervener recovered judgment against appellant upon that provision of the bond wherein appellant obligated itself to pay for all ''labor or material used in the prosecution of the work provided for in said contract.'' In substance, the intervener alleged that it had sold and delivered to the contractor the three boilers that are mentioned in the proceedings in respondent's appeal, and had also sold and delivered

to it other material, all of which was used in the prosecution of the work on said high school building; that there was due to the intervener from the contractor for said material a balance of $3,113.71, for which it prayed judgment, with interest. After the jury had returned a verdict in favor of the respond-. ent the matters arising upon the complaint in intervention and appellant's answer thereto were tried to the court, the same judge presiding who had presided in respondent's case. The trial resulted in findings of fact, conclusions of law and judgment in favor of the intervener, and the appellant appeals from that judgment.

The principal assignments on that appeal relate to the findings of fact. The findings of the court cover every phase of the case. After making the preliminary findings the court found:

"That on and between the 1st day of November, 1912, and the 10th day of January, 1913, at Salt Lake City, Salt Lake county, state of Utah, the intervener sold and delivered to said defendant Wright-Osborn Company, at its special instance and request and in the ordinary course of business, plumbing, heating and ventilating materials consisting of boilers, smokestack, breeching, black pipe and fittings of the agreed and reasonable value and purchase price of $5,863.71, f. o. b. Salt Lake City, Utah, all as appears from an itemized statement of said account hereinafter set forth.

"That all of said materials so sold and delivered as aforesaid were expressly ordered and purchased by said defendant Wright-Osborn Company, and were in good faith sold and delivered by the intervener to said defendant for use in the prosecution of the work provided for in the said contract between the plaintiff, the board of education of Salt Lake City and the said defendant Wright-Osborn Company hereinabove referred to.

"That all of said materials were actually delivered by the intervener to said defendant Wright-Osborn Company on the premises upon which said high school building was in process of erection, and all of said material was used in the prosecution of the work provided for in said contract.

"That in the sale of said materials no special terms of time

of payment was agreed upon; that said materials were bought and sold upon open running account payable on the 1st day of the month following deliveries.''

. The court further found:

''That said defendant Wright-Osborn Company, before placing its order with the intervener for tubular boilers, advised the plaintiff and its architect that it was negotiating with this intervener to purchase from the intervener three Kewanee tubular boilers, and the said plaintiff, on or about the 9th day of July, 1912, expressly approved of the three Kewanee tubular boilers to be furnished by the intervener, and thereupon said defendant Wright-Osborn Company placed its order for said boilers with the intervener.

''That this intervener received the specifications for said boilers through the Utah state agent of the Kewanee Boiler Company, who in turn made up said order from specifications relating to said boilers prepared by the architect for the plaintiff and furnished to the defendant Wright-Osborn Company, and in its hands at the time said order was placed.

''That the said state agent for the Kewanee Boiler Company and the defendant Wright-Osborn Company and the intervener made up said order in good faith, believing that it conformed exactly to the specifications adopted for the same by the plaintiff, and the intervener filled said order in good faith, and the said boilers so as aforesaid furnished conformed in every particular with the order so placed with the intervener.

''That all of the other material furnished by the intervener conformed to the order placed by said defendant Wright-Osborn Company with the intervener, and conformed to said contract and the specifications thereto attached.

''That the boilers were received upon the high school premises during the month of October, 1912, and were shortly thereafter placed in the permanent positions designed for them in the boiler room, and prior to the 17th day of January, 1913, were partly bricked in.

''That said boilers were thereafter, and subsequent to the 17th day of January, 1913, removed from their positions in

said boiler room by the plaintiff, and other boilers were sub-stituted.

"That said boilers were not in any particular defective in workmanship, design or material, and were fully capable of discharging the function required of boilers in connection with the heating and ventilating system of said high school building, and could have been insured up to 125 pounds' pressure by the Hartford Fire Insurance Company.

"That all of the materials sold and delivered by the intervener as aforesaid, excepting only the said three tubular boilers, and not exceeding 10 per cent. of the pipe and fittings, entered into and became a part of the finished high school structure.

"That the stack and breeching were ordered and sold in connection with and as a part of said three boilers, and entered into and became and still is a part of said finished high school structure.

"That the three boilers, while removed from the boiler room, were not removed and were not ordered removed from the premises, and were not returned by the plaintiff to the defendant Wright-Osborn Company, or to this intervener, and all of the materials so, as aforesaid, sold by the intervener, were, and still are, held and retained by plaintiff upon the high school premises, and were all used in the prosecution of the work provided for in said contract.   *   *   *

"That by virtue of an order made by this court in this cause the defendant Fidelity & Deposit Company of Maryland has been subrogated to all of the right, title, and interest of the plaintiff in and to any and all of said materials which did not become a part of the finished structure, subject to the payment of the judgment in favor of plaintiff."

The court also found that there was a balance due intervener for said material amounting to $3,113.71, for which sum, with interest, judgment was entered in its favor.

Appellant contends that the findings are not supported by the evidence.

The principal controversy arises with respect to the boilers which are referred to in the foregoing findings, and which are the same boilers that were in controversy on the ap-

peal against the respondent, and to which reference is 7
made in the course of the opinion on that appeal. The
evidence discloses that there were two sets of specifications
prepared affecting the boilers to be used in the heating plant,
which, for convenience, we shall designate as specifications
No. 1 and specification No. 2. The difference in the two speci-
fications is important in some particulars.

One of the questions submitted to the jury in the respond-
ent's case was whether specifications No. 1, or specifications
No. 2, to which the boilers had to conform, had been adopted
by the architect. The jury found that specifications No. 1 had
been adopted by the architect, and that the boilers purchased
by the contractor did not comply with those specifications,
and hence the contractor had failed to comply with the terms
of his contract, in that he had failed to furnish boilers in ac-
cordance with the specifications. Upon the other hand, the
judge who tried the intervener's case, and who also presided
at the trial of respondent's case, found that specifications No.
2 were the ones that had been adopted by the architect, and
that the boilers in question which were purchased by the con-
tractor from the intervener were in all respects as required by
the specifications. The findings of the jury in respondent's
case and the findings of the court in the intervener's case are
therefore in direct conflict. The findings of the jury and
those of the court are, however, based upon conflicting evi-
dence. It was the exclusive province of the jury to determine
the weight of the evidence and the credibility of the witnesses
in respondent's case and such was the exclusive province of
the judge in the intervener's case. The verdict of the jury
upon the issues presented in respondent's case and the find-
ings of the court in the intervener's case must therefore be
considered as entirely independent, and as though they consti-
tuted the result in two separate and distinct cases. We, under
our Constitution, are powerless to interfere upon a question
of fact in case there is some substantial evidence in support of
any fact which is in dispute and which is material to the con-
troversy. Nor, under the evidence, are the verdict of the jury
and the findings of the court so inconsistent that we can say
as matter of law that both cannot stand. It may be conceded

that there are several conclusions of law interspersed among the findings of fact which, perhaps, in some respects, might be said to go beyond the evidence; but those conclusions can be given no effect. The findings are therefore not vulnerable to the objections made against them by counsel.

Counsel, however, urge that appellant is not liable for the unpaid purchase price of the boilers because they ultimately did not become an integral part of the heating plant. Under the facts and circumstances of this case, and in view of the provisions of the bond, counsel's argument should not prevail. Under the findings of fact, all of which are supported by sufficient evidence, the boilers were purchased and sold in good faith. They were purchased and delivered pursuant to, and for the very purpose contemplated by, the contract entered into between the respondent and the contractor. They fully complied with all the specifications, and, upon delivery, ceased to be the property of the intervener. To all intents and purposes the boilers were purchased and used in the prosecution of the work, and hence the contractor became liable to the intervener for the unpaid purchase price thereof. If that be true, then why, under the foregoing facts and circumstances, is not the appellant also liable on its bond? The Supreme Court of Washington has held that an indemnitor is liable under circumstances which, in principle, do not differ from the circumstances in this case, in the case of *Crane Co.* v. *United States, etc., Co.,* 74 Wash. 91, 132 Pac. 872.

Suppose in this case the school building and the boilers had been destroyed immediately after they had been placed in the building, but before they became a part of the heating plant. They then would not, and, could not, have become an integral part of the plant, and yet would any one seriously contend that, under the facts and circumstances before stated, the contractor and his indemnitor would not be liable to the intervener for the unpaid purchase price? Again, suppose that the boilers had been purchased and delivered in good faith, and pursuant to the contract, and for the purpose contemplated therein, and that they in all respects had conformed to the specifications, and the title thereto had passed to the

contractor, but were destroyed before they actually became a part of the plant. Who would then be liable? There is, there can be, but one answer to the question. It must be conceded that the facts and circumstances of this case in many respects stamp it as one that is unusual and extraordinary. That, standing alone, however, cannot change legal principles. In our opinion neither the contractor nor the indemnitor can, upon legal grounds, escape liability.

It is not necessary to review or to refer to the many cases that are cited by counsel in their briefs. The questions decided in the cases referred to by appellant's counsel in nearly every instance arose under mechanic's lien statutes. It is general knowledge that those statutes differ in the different states. For that and for other reasons which appear in the decisions, those cases can be given no controlling effect in this case, and hence need no further consideration.

It is further contended that the trial court erred in applying the payments made by the contractor to the intervener on account for materials sold and delivered. We have already held that the three boilers were furnished pursuant to the contract and were covered by the indemnity bond. If that conclusion is sound, and we think it is, then, as a matter of course, the question of the application of payments is not material in this case so far as that question affects the purchase price of the boilers. What is true of the boilers is, however, also true of the ten per cent. of the pipe and other materials that were sold and delivered by the intervener to the contractor, but which did not actually become a part of the heating plant. All of the materials sold and delivered by the intervener were sold and delivered pursuant to the contract entered into by the contractor with the respondent, and while not quite all of the material actually became a part of the heating plant, neverthless all came within the rule announced by the Supreme Court of Washington in the case of *Crane Co. v. United States, etc., Co., supra.* The question of the application of the payments is therefore also not applicable to those materials. It therefore is not necessary for us to determine the important question respecting the rule governing the application of payments, as that question may arise between a material-

man and a surety upon the contractor's bond where the contractor defaults in paying for all of the material, but has made payments on account, which payments are sought to be applied by the materialman on material not covered by the surety bond. That question is left open until it legitimately arises.

The judgment in favor of the respondent and the judgment in favor of the intervener are therefore affirmed, with costs to respondent on the appeal from the judgment in its favor and with costs to the intervener on the appeal from the judgment in its favor.

McCARTY and CORFMAN, JJ., concur.